# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

AUNDREA L. ARMSTRONG,

  Plaintiff,

v.

MONROE COUNTY, a Michigan
municipal corporation, THE
MONROE COUNTY BOARD OF
COMMISSIONERS, DAVID
VENSEL, in his individual and
official capacities, DAVID
HOFFMAN in his individual and
official capacities, JAY HEINSERLING
in his individual and official capacities,
J. HENRY LIEVENS in his individual
and official capacities, and RANDY
RICHARDVILLE in his individual
and official capacities, and WILLIAM
SISK, in his individual and official
capacities,

  Defendants.

Case No.

Hon.

_____

Joseph X. Michaels (P79084)
Adam M. Taub (P78334)
CROSON, TAUB, & MICHAELS, PLLC
Attorneys for Plaintiff
455 E. Eisenhower Pkwy, Ste. 75
Ann Arbor, Michigan 48108
(734) 519-0872
jmichaels@ctmlawyers.com
ataub@ctmlawyers.com

_____

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff, AUNDREA ARMSTRONG, by and through her attorneys, CROSON, TAUB, & MICHAELS, PLLC, hereby brings this action against Defendants MONROE COUNTY, THE MONROE COUNTY BOARD OF COMMISSIONERS, DAVID VENSEL, DAVID HOFFMAN, JAY HEINSERLING, J. HENRY LIEVENS, RANDY RICHARDVILLE, and WILLIAM SISK in their individual and official capacities and hereby states as follows:

## INTRODUCTION

1.      Plaintiff Aundrea Armstrong ("Ms. Armstrong") is, and has been, a dedicated public servant. She served for years in a variety of roles in Monroe County government, ultimately rising to Deputy County Administrator and being chosen as the designated successor-in-waiting to the County Administrator/Chief Financial Officer under a succession plan approved by the County Board. However, after Ms. Armstrong exercised her constitutional right to free expression—by submitting a character reference to a criminal defense attorney for use in criminal justice proceedings and refusing pressure to provide an illegal County job to an individual tasked with her investigation—Defendants unlawfully and illegally sought to end her employment.

2.      Almost immediately upon learning of Ms. Armstrong's protected conduct, the Individual Defendant Board members, acting in their individual

2

capacities and as representatives of Monroe County, concocted a scheme to "eliminate" Ms. Armstrong's position—and her position alone—even though just days before no such restructuring had even been contemplated. Additionally, Defendants only targeted Ms. Armstrong for her protected activity, even though another male employee had engaged in the precise type of speech which led to her termination.

3.     During a lengthy Board discussion regarding Ms. Armstrong's termination, some Board members expressed strong resistance to Defendants' actions, pointing out that the budget had been approved *in toto* previously and that Ms. Armstrong was designated as the successor to the County Administrator/Chief Financial Officer on a multi-year succession plan. Notwithstanding these objections, the Individual Defendants, as a majority of the highest decision-making body in the County, moved forward with their plan to terminate Ms. Armstrong due solely to her protected activity and gender.

4.     Ms. Armstrong has suffered significant economic and noneconomic damages as a result of her unlawful termination. Ms. Armstrong thus brings this civil-rights action pursuant to the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, Article I, §§ 2 and 5 of the Michigan Constitution of 1963, the Eliott-Larsen Civil Rights Act, MCL §37.2101, *et seq.*, and Michigan common law to remedy her unconstitutional and unlawful termination.

3

## **PARTIES, JURISDICTION, AND VENUE**

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as some of the claims asserted arise out of federal constitutional and statutory law, namely 42 U.S.C. § 1983 and U.S CONST. AMEND. I, XIV.

6.     Supplemental jurisdiction over Plaintiff's state-law claims is appropriate under 28 U.S.C. § 1367 as this Court has original jurisdiction over Plaintiff's federal claims and her state-law claims arise from the same transaction or occurrence.

7.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because all of the events giving rise to this action took place in this judicial District, and Defendants are either governmental entities within this judicial District or individuals who reside in this judicial District.

8.     Plaintiff Aundrea Armstrong is an individual who resides in Monroe County, Michigan.

9.     Defendant MONROE COUNTY is a governmental body created by and operated under the laws of the State of Michigan. It exercises governmental control in this judicial District.

10.     Defendant MONROE COUNTY BOARD OF COMMISIONERS is a governmental body created by and operated under the laws of the State of Michigan. It exercises governmental control in this judicial District.

11.     Defendant DAVID VENSEL is an elected Board member of Monroe County. Upon information and belief, he resides in Monroe County.

12.     Defendant DAVID C. HOFFMAN is an elected Board member of Monroe County. Upon information and belief, he resides in Monroe County.

13.     Defendant JAY HEINSERLING is an elected Board member of Monroe County. Upon information and belief, he resides in Monroe County.

14.     Defendant J. HENRY LIEVENS is an elected Board member of Monroe County. Upon information and belief, he resides in Monroe County.

15.     Defendant RANDY RICHARDVILLE is a former elected Board member of Monroe County. Upon information and belief, he resides in Monroe County.

16.     Defendant WILLIAM SISK is a former official of Monroe County and served on its *ad hoc* ethics committee. Upon information and belief, he resides in Monroe County.

## STATEMENT OF FACTS

### A.     *Background Facts*

17.     Plaintiff Aundrea Armstrong is a long-time dedicated Monroe County employee. In each of her various roles over nearly 25 years, Ms. Armstrong performed in an exemplary manner, receiving high marks and without any discipline of any kind.

18.     She delivered timely, positive, and impactful outcomes for the County throughout her career. In fact, her activities saved the County and its taxpayers millions of dollars.

19.     Ms. Armstrong previously served as County Human Resources Director and was approved to become Deputy County Administrator/Chief Financial Officer by unanimous vote of the Board of Commissioners on November 1, 2022.

20.     This promotion became effective January 3, 2023 as part of a succession and staffing plan whereby she would become County Administrator/Chief Financial Officer upon the retirement of Michael Bosanac, the current County Administrator/Chief Financial Officer.

21.     Defendant MONROE COUNTY BOARD OF COMMISSIONERS unanimously passed this succession plan. Individual Defendants VENSEL, LIEVANS, HOFFMAN, and RICHARDVILLE were board members at the time and voted in the affirmative.

22.     This succession and staffing plan was—at the time—described as "a multi-phase strategy similar to what many comparable counties, as well as Fortune 500 companies, have followed for decades.

23.     As reflected in the contemporaneous documents, the Board fully acknowledged that the County's Central Office staffing was below a basic level, operating with nearly one-third fewer staff than it had in the mid-2000s. In fact, the County's own independent public auditor found the Administration to be understaffed and otherwise encouraged the County to bolster staffing.

24.     After the MONROE COUNTY BOARD OF COMMISIONERS approved this plan, Ms. Armstrong continued her exemplary service to the County and invested significant time and effort in preparing herself to be fully ready to assume the position of Administrator/Chief Financial Officer in earnest after the planned retirement of Mr. Bosanac.

**B.** ***Ms. Armstrong Engaged in First Amendment Speech by Writing a Character Reference Which Was Ultimately Submitted to a Federal Judge***

25.     Through her long-term employment with the County, working as a high-level administrative employee, Ms. Armstrong worked closely with the Administrator (to whom she reported) as well as members of the Monroe County Board of Commissioners, including members of many different political opinions and members of both major political parties.

7

26.     Relevant to this case, Ms. Armstrong worked with Mark Brant, a Republican County Commissioner who was elected by the voters of Monroe County in 2012 and took office on January 1, 2013.

27.     In the fall of 2020, law enforcement raided then-Commissioner Brant's home and business.

28.     At this time, all members of Defendant MONROE COUNTY BOARD OF COMMISIONERS were made aware of the raid but took no adverse action against then-Commissioner Brant. In fact, on January 5, 2021, his fellow members elected him as Chairman, a capacity in which he served until his resignation.

29.     In late May 2024, Mr. Brant asked Ms. Armstrong—along with County Administrator Bosanac—to write character letters for his "personal legal issues".

30.     Mr. Brant told Ms. Armstrong that he was involved in a criminal matter involving his private business operations and that he was innocent and fighting the charges. He asked for a character letter as part of his defense of the charges.

31.     Based on these representations, Ms. Armstrong believed he was still fighting his charges (and did not even know what charges were filed), and it was her understanding that her character letter would be submitted to a public body, such as a prosecutor's office, as part of the decision-making process regarding which charges would be pursued or not pursued.

Case 4:25-cv-13634-SDK-APP   ECF No. 1, PageID.9   Filed 11/14/25   Page 9 of 34

32.    Ms. Armstrong was also aware that Mr. Bosanac received the same request for a character reference from Mr. Brant's criminal attorney and that Mr. Bosanac had agreed to write one as well.

33.    Mr. Bosanac, Ms. Armstrong's direct supervisor, was informed by Ms. Armstrong prior to her decision and action to write such a letter and supported it and indeed wrote one himself.

34.    Ms. Armstrong's letter was addressed "To whom it may concern" and sent to the care of Mr. Brant's attorney. Ms. Armstrong laid out her work with Mr. Brant for over 10 years, his leadership in various projects, and his mentorship and guidance.

35.    The letter was unrelated to her duties with the County, written in her personal capacity, and signed in her individual capacity. Ms. Armstrong did not claim to speak for the County and did not utilize County letterhead.

36.    Ultimately, Mr. Brant's attorney submitted the letter to the Honorable Judge Sara Lioi of the Northern District of Ohio Eastern Division for the criminal case *United States v. Brant, et al,* Case No 1:22-cr-00701, ECF # 45, PageID 304.

37.    Unbeknownst to Ms. Armstrong, Mr. Brant had pleaded guilty to certain charges months prior, and the character references written by Ms. Armstrong and Mr. Bosanac were submitted in a sentencing memorandum supporting Mr.

Brant's proposed sentence. Ultimately, Judge Lioi sentenced Mr. Brant to 18 months in federal prison and a large fine on September 19, 2024.

### C. After Mr. Brant's sentence Becomes Public, Ms. Armstrong Is Subject to Retaliation and Disparaged Publicly for Political Reasons

38. Sometime following the sentencing, news of Mr. Brant's conviction became public and was widely discussed in the County.

39. As Mr. Brant was still a sitting County Commissioner, the other Board members then reached out to County attorneys for a legal opinion on the matter.

40. The County ultimately determined the conviction was effective on the date of the sentencing and that Mr. Brant could no longer serve as a commissioner.

41. Mr. Brant thereafter resigned on October 1, 2024, and the Board of Commissioners accepted his resignation at that same meeting.

42. After the sentencing memo became public, Ms. Armstrong was subjected to direct attacks in public forums and unlawful retaliation. In fact, at public Board of Commissioner meetings, a candidate for County Commissioner and former State Representative from the Democratic Party, William LaVoy, disparaged Ms. Armstrong's character, qualifications, and professionalism with untruthful public comments.

43. The Board of Commissioners failed to correct the record of these untruthful statements.

44.     In fact, current-Chairman DEFENDANT VENSEL, at the October 15, 2024, meeting, accused Ms. Armstrong of hiding knowledge from the Board and claimed, "If this were a school and the Superintendent and Assistant Superintendent knew and didn't tell the Board, they would both be fired."

45.     Likewise, DEFENDANT HEINSERLING stated that he agreed transparency was needed and it was "disrespectful" the commissioners weren't informed.

46.     Neither DEFENDANT VENSEL nor DEFENDANT HEINSERLING acknowledged that Ms. Armstrong, as Deputy County Administrator, had informed her direct supervisor of the request and received support and approval.

47.     The following day, on October 16, Ms. Armstrong contacted DEFENDANT VENSEL regarding his comments that she and Mr. Bosanac should be terminated.

48.     In that call DEFENDANT VENSEL said he was not "really out to fire them", that he was "running for reelection" but that he understood why they had written letters, and that he probably would have done the same.

49.     DEFENDANT VENSEL ended the conversation by saying that he looked forward to continuing to work with her and her transition into the Administrator/CFO position.

50.     Ms. Armstrong left the conversation believing things had been cleared up, that they were moving forward with the succession plan, and that DEFENDANT VENSEL was not intent on any other action against her or Mr. Bosanac.

51.     Behind the scenes, however, Individual Defendants were conspiring to create an ethics committee which would have a "flavor of bipartisanship" but would eliminate Ms. Armstrong's position, with such action being taken in direct retaliation for Ms. Armstong's decision to write the character letter.

52.     In October, DEFENDANT WILLIAM SISK, a former chairman of the Board who had helped with the campaigns of many incumbent members, including DEFENDANT VENSEL, lobbied several board members to be named to the committee, including by texting DEFENDANT RICHARDVILLE asking to be considered.

53.     DEFENDANTS RICHARDVILLE and LIEVENS pushed for DEFENDANT SISK to join the committee. And, when fellow Commissioner Greg Moore objected to DEFENDANT SISK'S appointment, DEFENDANTS referred to Mr. Moore in text messages as a "stinker" and "little bitch."

54.     At a meeting on November 7, the Board's "Operation Committee" ultimately voted to create the *ad hoc* ethics committee dedicated to investigating Mr. Brant's conviction/resignation, and it included DEFENDANT SISK on the *ad hoc* ethics committee, along with two current Board members.

55.     Prior to the November 7, 2025 Operations Committee meeting, DEFENDANT RICHARDVILLE spoke to Mr. Bosanac and Ms. Armstrong in the Finance Conference room and assured them that the committee was going to "look forward" and make sure the County had adequate policies and procedures in place for the future.

56.     Board Chairman DEFENDANT RICHARDVILLE made clear that the committee was not on a "witch hunt," and no one was looking to fire Ms. Armstrong or Mr. Bosanac.

57.     This was false. The actual motion to form the committee had a stated goal of "discovery" into the facts regarding Mr. Brant's legal issues.

58.     At the next full Board meeting, on November 12, the Brant issue was again a large topic of discussion. Mr. LaVoy, who had lost his bid for County Commissioner just days before, heavily criticized Mr. Bosanac and Ms. Armstrong and said that the termination of administrators would restore public trust.

59.     Commissioners again did not object to these statements, nor did they defend Ms. Armstrong or her right to free speech.

60.     After the November 12 meeting, Ms. Armstrong and Mr. Bosanac again spoke to then-Chairman DEFENDANT RICHARDVILLE at his request.

61.     DEFENDANT RICHARDVILLE updated them on the creation of the committee and acknowledged that there had been no guidelines on writing a

character letter, no procedures to follow, and no rules at the time they had written their letters.

62.     Ms. Armstrong stated that the idea no one knew of Mr. Brant's situation was patently false and that she had known only of general legal troubles—the same as all other Commissioners who were aware, at the very least, of an FBI raid.

63.     Ms. Armstrong reiterated that she did not know the legal situation beyond the raid and that Mr. Brant's attorney had asked for a character reference without informing her of the nature of his criminal matter.

**D.      *Ms. Armstrong Is Pressured to Create a Position for a Member of the Committee Investigating Her and Refuses.***

64.     Exactly one week after the November 12, 2024, Board meeting, Ms. Armstrong was pressured to create a specific permanent County position for DEFENDANT SISK, the same individual who had been appointed to the *ad hoc* ethics committee investigating her and Mr. Bosanac.

65.     DEFENDANT SISK had been working as a temporary probation officer on a part-time basis as he was required to work part-time under the terms of his County pension. However, the funding for the part-time position was set to expire on December 31, 2024, based on the then-adopted budget. After that, DEFENDANT SISK was out of a job.

66.     On the morning of November 19, 2024, Ms. Armstrong, along with the County HR Director Jeff McBee, met with 1st District Court Judges Michael Brown and Amanda Eicher and Court Administrator Jessica Chaffin.

67.     At that meeting, the Court representatives requested that the County administration create a permanent part-time probation officer position for DEFENDANT SISK.

68.     At the time, the County did not have a part time probation officer position. And, as DEFENDANT SISK was a retiree and ineligible for full-time County reemployment, in order to keep DEFENDANT SISK employed, the County would have to create a part-time position, which was intended to be filled specifically by DEFENDANT SISK in order to accommodate his personal situation.

69.     Ms. Armstrong categorically refused this request, specifically stating that she would not put herself—or even the Board—in the position of creating, or recommending the creation of, a permanent part-time probation officer position that was not previously funded by the County to a member of the body tasked with investigating her and the Board.

70.     Ms. Armstrong correctly believed that this action would be an unethical conflict of interest for a public officer such as herself, and a violation of Michigan law regarding ethics in public office.

71. In that meeting, Ms. Armstrong specifically outlined the ethical and moral dilemma of creating this new position when DEFENDANT SISK was on the ethics committee to investigate her and the Board members' knowledge of Mr. Brant's legal situation.

72. Ms. Armstrong did propose other solutions that she could perform ethically. Specifically, Ms. Armstong recommended that the County create a regular, full-time position in the ordinary manner with Board approval.

73. This option would provide the County with the additional benefit of a full-time position with no conflict-of-interest concerns, nor would it be designated for one specific individual.

### E. Later that Night, After Ms. Armstrong Refused to Support the Creation of a Position for Sisk, Commissioners Begin the Process of Terminating Ms. Armstrong, but not Mr. Bosanac or any Other County Employee

74. That same night after her meeting with HR and the County judges, earlier in the day on November 19, 2024, DEFENDANT RICHARDVILLE advised Mr. Bosanac prior to the start of the Board of Commissioners meeting that "the budget would not be adopted" as scheduled because DEFENDANT VENSEL had "questions about the succession plan of the Administration and the 1st District Court budget."

75. The Board thereafter decided to delay the vote on the budget for two weeks to address DEFENDANT VENSEL'S questions. DEFENDANTS VENSEL,

RICHARDVILLE, HOFFMAN, LIEVANS, and HEINSERLING all voted in the affirmative to delay a budget which included Ms. Armstrong's position.

76.     During this two-week delay, the individual Defendants further conspired to eliminate Ms. Armstrong's position. Defendants VENSEL and RICHARDVILLE texted each other the succession plan and discussed their plan to eliminate Ms. Armstrong's position. Defendants RICHARVILLE, VENSEL, and LIEVENS met prior to the upcoming board meeting, outside of regular order, to ensure "all of [their] bases were covered]."

77.     Following the delay, at the December 3, 2024 Board of Commissioners meeting, DEFENDANT VENSEL made the motion to remove the Deputy County Administrator/CFO position from the funded positions in the 2025 budget but to accept the remainder of the budget as recommended by Mr. Bosanac.

78.     Prior to making this decision to eliminate Ms. Armstrong's position funding in the budget, DEFENDANT VENSEL conducted no analysis or objective review to determine if the position was no longer warranted. He did not cite any financial information regarding the costs of the position, nor did he consult others or conduct financial analysis on the need to save the funding. In fact, the County budget was not only balanced, but in a surplus, in part due to Ms. Armstrong's strong leadership.

79.     Thus, only Ms. Armstrong's position was singled out for elimination in an organization with over 500 employees. Nor were any other cost saving measures or financial cutbacks conducted.

80.     During the Board meeting, some commissioners expressed shock that Mr. Armstrong's position was being eliminated late in the budget process, expressed concern with terminating Ms. Armstrong due to her valued work with the County, and pointed out that the succession plan was passed by the full Board freely.

81.     Notwithstanding these objections, the Individual Defendants persisted in their unlawful termination of Ms. Armstrong.

82.     Their true motive for the termination was not any financial concern but a specific targeting of Ms. Armstrong due to her protected activity and gender.

83.     During the roll-call vote, DEFENDANT DAVID VENSEL voted to terminate Ms. Armstrong due to unconstitutional and lawful reasons, including in retaliation for her first amendment rights, her opposition to unlawful activity, and her gender.

84.     During the roll-call vote, DEFENDANT DAVID HOFFMAN voted to terminate Ms. Armstrong due to unconstitutional and lawful reasons, including in retaliation for her first amendment rights, her opposition to unlawful activity, and her gender.

85.     During the roll-call vote, DEFENDANT JAY HEINSERLING voted to terminate Ms. Armstrong due to unconstitutional and lawful reasons, including in retaliation for her first amendment rights, her opposition to unlawful activity, and her gender.

86.     During the roll-call vote, DEFENDANT J. HENRY LIEVENS voted to terminate Ms. Armstrong due to unconstitutional and lawful reasons, including in retaliation for her first amendment rights, her opposition to unlawful activity, and her gender.

87.     During the roll-call vote, DEFENDANT RANDY RICHARDVILLE voted to terminate Ms. Armstrong due to unconstitutional and lawful reasons, including in retaliation for her first amendment rights, her opposition to unlawful activity, and her gender.

88.     With a final vote of 5-3, the Motion carried, and Defendant MONROE COUNTY, acting through the actions of its highest decision-making body, Defendant THE MONROE COUNTY BOARD OF COMMISONERS, terminated Ms. Armstrong due to unconstitutional and lawful reasons, including in retaliation for her First Amendment rights, her opposition to unlawful activity, and her gender.

89.     As a result of this termination. Ms. Armstrong suffered significant economic and non economic damages. Prior to the termination, Ms. Armstrong had been selected as the designated successor and the first female Administrator/Chief

Financial Officer. She was now unemployed due to the unlawful actions of the Defendants. These unlawful actions significantly damaged, among other things, her earning capacity, future pension and retirement benefits, and harmed her professional reputation.

### F.    Even After her Termination, Individual Defendants Engage in a Conspiracy to Retaliate Further Against Ms. Armstrong

90.    As her position was eliminated, Ms. Armstrong was terminated. But she was still eligible for other County employment that would have provided her valuable service credit for her pension, for which she was close to being eligible.

91.    Knowing this, Defendants conspired to ensure that Ms. Armstrong was not placed in any other County position, with the intent to further harm her economically and professionally.

92.    On December 4th, DEFENDANT SISK texted DEFENDANT RICHARDVILLE the following:

Randy

Just a quick note. You have to inform Bosanac he cannot backfill Aundrea into HR or any position. He will try to place her quickly into a job.

93.    Following this action by Defendants, Bosanac's was called to a meeting with DEFENDANT RICHARDVILLE as well as DEFENDANT LIEVENS. This meeting took place on December 5, 2024. During this meeting Bosanac was directed that he was not to place Ms. Armstrong in any County job. After the conclusion of

this meeting Bosanac informed Ms. Armstrong of the directive he was given by DEFENDANT RICHARDVILLE and DEFENDANT LIEVANS (Chairman and Vice-Chairman of the Board of Commissioners).

94.    On December 18, 2024, DEFENDANT RICHARVILLE reiterated this message to Mr. Bosanac. Mr. Bosanac indicated he was considering two roles for which Ms. Armstrong was qualified and could potentially fill. DEFENDANT RICHARDVILLE indicated that Mr. Bosanac could not place Ms. Armstrong in any position without conferring with the Board, including the Commissioner-Defendants.

95.    In accordance with this conspiracy, the Individual Defendants conspired to prevent Ms. Armstrong from receiving County employment, even though as her termination was ostensibly a "position elimination," and she should have been eligible for any open County position.

96.    Ultimately, Ms. Armstrong received employment in the Monroe County's Sheriff's Office, an entity which did not need Board approval or input to hire Ms. Armstrong. She was hired as a corrections officer at a significant pay cut until her retirement.

97.    Following her transfer to the Sheriff's Office, the Individual Defendants continued their conspiracy—expressing their displeasure to the Monroe County

Sheriff that he had hired Ms. Armstrong in an attempt to have her employment terminated.

## CAUSES OF ACTION

### COUNT I
### FIRST AMENDMENT RETALIATION
### 42 U.S.C. § 1983: U.S. CONST. AMEND. I (speech and petition clauses)
*(Against all Defendants)*

98. Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

99. The Defendants are all "persons" covered by the meaning of 42 U.S.C. § 1983.

100. At all relevant times, the Commissioner-Defendants acted under color of state law by virtue of the performance of their duties as employees of Defendant MONROE COUNTY, which is created by and operated under the laws of the State of Michigan.

101. DEFENDANT SISK acted under color of state law, as he was an employee of Monroe County 1st District Court, and serving in his capacity as an appointed member of the *ad hoc* ethics committee, a public body created by Defendant MONROE COUNTY BOARD OF COMMISSIONERS.

102. Defendant MONROE COUNTY acted through its highest decision-making body under Michigan law, Defendant THE MONROE COUNTY BOARD

OF COMMISONERS, with respect to Plaintiff's employment, subjecting it to municipal liability. *Jett v. Dallas Independent. School Dist.*, 491 U.S. 701 (1989).

103. Plaintiff engaged in protected activity under the speech clause of the First Amendment of the United States Constitution by, among other things, submitting a letter to a criminal attorney regarding the character of a public official with the intent it be used by officials to make charging decisions, as well as opposing the creation of a County position for a person investigating her.

104. Plaintiff engaged in protected activity under the First Amendment of the United States Constitution by petitioning her government for a redress of grievances by submitting a letter to a criminal attorney regarding the character of a public official with the intent it be used by officials to make charging decisions, as well as opposing the creation of a County position for a person investigating her.

105. The Individual Defendants' actions against Plaintiff, in their individual and official capacities, were motivated in significant part by Plaintiff's constitutionally protected speech and petition.

106. The municipal Defendant's actions through its highest decision-making body, were motivated in significant part by Plaintiff's constitutionally protected speech and petition.

107. Plaintiff suffered an objectively adverse employment action when Defendants terminated her employment.

108.   But for Plaintiff's exercise of her constitutionally protected right to free speech and petition, she would not have been terminated.

109.   Individual Defendants violated Plaintiff's clearly established constitutional right to be free of retaliation for speech and petition under the First Amendment to the U.S. Constitution and are not entitled to qualified immunity.

110.   These actions were undertaken via a policy, practice, or procedure of DEFEDANT MONROE COUNTY.

111.   As a result of Defendants' unlawful conduct, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic loss, including but not limited to, lost wages, damage to professional reputation, emotional distress, outrage and humiliation.

112.   The Individual Defendants' actions were done intentionally and/or with reckless disregard to Plaintiff's federally-protected rights, entitling her to punitive damages.

**COUNT II**
**FIRST AMENDMENT RETALIATION**
**42 U.S.C. § 1985: Conspiracy**
***(Against Individual Defendants)***

113.   Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

114.   The Individual Defendants agreed to a common plan or scheme to deprive Plaintiff of her civil rights.

24

115.   The commissioner-Defendants along with DEFENDANT SISK came to an agreed plan or purpose to deprive Plaintiff of her right to public employment because of her protected activity under the First Amendment

116.   Plaintiff engaged in protected activity under the speech clause of the First Amendment of the United States Constitution by, among other things, submitting a letter to a criminal attorney regarding the character of a public official with the intent it be used by officials to make charging decisions, as well as opposing the creation of a County position for a person investigating her.

117.   Plaintiff engaged in protected activity under the First Amendment of the United States Constitution by petitioning her government for a redress of grievances by submitting a letter to a criminal attorney regarding the character of a public official with the intent it be used by officials to make charging decisions, as well as opposing the creation of a County position for a person investigating her.

118.   The Individual Defendants did conspire and agree on a plan of action to deprive Plaintiff of her rights to constitutionally protected speech and petition.

119.   Plaintiff suffered an objectively adverse employment action when Defendants terminated her employment.

120.   Plaintiff suffered an objectively adverse employment action when Defendants conspired to terminate her employment and conspired to prevent her from obtaining alternate employment. As a result of Defendants' unlawful conduct,

Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic loss, including but not limited to, lost wages, damage to professional reputation, emotional distress, outrage and humiliation.

121.    The Individual Defendants' actions were done intentionally and/or with reckless disregard to Plaintiff's federally-protected rights, entitling her to punitive damages.

**COUNT III**
**FREEDOM OF SPEECH AND PETITION**
**M<small>ICH</small>. C<small>ONST</small>. OF 1963, A<small>RT</small>. I, §§ 3, 5**
*(Against Defendant Monroe County)*

122.    Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

123.    Defendant MONROE COUNTY is a Michigan Governmental entity, subject to the dictates of the Michigan Constitution.

124.    Plaintiff engaged in protected activity under Article I, § 3 of the Michigan Constitution of 1963 by petitioning her government for the redress of grievances by submitting a letter to a criminal attorney regarding the character of a public official, with the intent it be used by officials to make charging decisions, as well as opposing the creation of a County position for a person investigating her.

125.    Plaintiff engaged in protected activity under Article I, § 5 of the Michigan Constitution of 1963 by speaking on a matter of public concern, including

by submitting a letter to a criminal attorney regarding the character of a public official with the intent it be used by officials to make charging decisions.

126.  Defendant MONROE COUNTY's actions against Plaintiff were motivated in significant part by Plaintiff's constitutionally protected activities.

127.  Plaintiff suffered an objectively adverse employment action when Defendant MONROE COUNTY terminated her employment.

128.  But for Plaintiff's exercise of her constitutionally protected right to free speech and petition, she would not have been terminated.

129.  As a result of Defendant MONROE COUNTY'S unlawful conduct, Plaintiff was harmed, and continues to be harmed, in that she has suffered economic and non-economic loss, including but not limited to, lost wages, damage to professional reputation, emotional distress, outrage and humiliation.

**COUNT IV**
**Elliott-Larsen Civil Rights Act Sex Discrimination**
**MCL 37.2202(1)(a)**
*(Against All Defendants)*

130.  Plaintiff incorporates by reference each preceding Paragraph as though fully restated herein.

131.  At all relevant times, Defendant MONROE COUNTY was an employer, and Plaintiff was an employee covered by and within the meaning of the Elliott-Larsen Civil Rights Act. MCL § 37.2101.

132.    At all relevant times, Individual Defendants and Defendant THE MONROE COUNTY BOARD OF COMMISSIONERS acted as "agents" of an employer and are thus employers covered by and within the meaning of the Elliott-Larsen Civil Rights Act. MCL § 37.2201(a).

133.    Plaintiff is a member of a protected group because of her sex, female.

134.    Plaintiff was subjected to adverse employment actions, up to and including termination of her employment.

135.    Defendants' actions were motivated by unlawful discrimination against Plaintiff because of her sex.

136.    But for Plaintiff's sex, Defendants would not have terminated her.

137.    Defendants' actions constituted unlawful discrimination on the basis of sex in violation of MCL 37.2202(1)(a).

138.    As a direct and proximate result of Defendants' violation of the ELCRA, Plaintiff has suffered bodily injury, feelings of depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

139.    As a direct and proximate result of Defendants' violation of the ELCRA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits and will so suffer in the future; she has been required to employ

the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

**COUNT V**
**Termination In Violation of Michigan Public Policy**
<u>**Michigan Common Law**</u>
*(Against Monroe County)*

140.   Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth at length herein.

141.   At all relevant times, Defendant MONROE COUNTY was Plaintiff's employer, and Plaintiff was its employee as defined by Michigan common law.

142.   Plaintiff repeatedly refused to engage in a course of conduct that was illegal and contrary to the public policy of this State. Specifically, Plaintiff refused to create an unfunded permanent County position for a person actively investigating her.

143.   The public policy of the state of Michigan dictates that Public officials must be free of conflicts of interest. the Michigan State Ethics governs the conduct of employees of local governments such as Ms. Armstrong. The State Ethics Act provides:

> A public officer or employee shall not solicit or accept a gift or loan of money, goods, services, or other thing of value for the benefit of a person or organization, other than the state, which tends to influence the manner in which the public officer or employee or another public officer or employee performs official duties.

MCL § 15.342.

29

144.    Ms. Armstrong refused to engage in a course of conduct in which a job—a thing of value—would be provided for DEFENDANT SISK and would intend to influence the performance of his public duties as a member of the *ad hoc* committee investigating her.

145.    Ms. Armstrong's participation in such a course of conduct would have violated the State Ethics Act and Michigan Public Policy.

146.    Defendant MONROE COUNTY subjected Plaintiff to adverse employment actions, including her termination and refusing to consider her for alternate employment, because of her failure to engage in this course of conduct.

147.    Defendant MONROE COUNTY in bad-faith, wrongfully, maliciously, and intentionally terminated Plaintiff's employment in violation of the public policy of the State of Michigan.

148.    But for Plaintiff's refusal to engage in unlawful activities, she would not have been terminated.

149.    As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained injuries and damages including but not limited to, loss of earnings and earning capacity; loss of career opportunities; loss of fringe and retirement benefits; mental anguish; physical and emotional distress; humiliation and embarrassment; loss of professional reputation.

<u>**RELIEF REQUESTED**</u>

30

WHEREFORE, Plaintiff Aundrea Armstrong prays that this Honorable Court grant the following remedies:

a.  Compensatory damages for monetary and nonmonetary loss in whatever amount she is found to be entitled;

b.  Exemplary and punitive damages in whatever amount she is found to be entitled;

c.  A judgment for lost wages and benefits, past and future, in whatever amount she is found to be entitled;

d.  An order of this Court reinstating Plaintiff to the positions she would have if there had been no wrongdoing by Defendants;

e.  An injunction of this Court prohibiting any further unconstitutional or illegal acts by Defendants;

f.  An award of interest, costs and reasonable attorney fees; and

g.  Any other equitable relief this Court finds appropriate.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and all relief requested in this Complaint.

Respectfully submitted,
CROSON, TAUB, & MICHAELS, PLLC

/s/ Joseph X. Michaels
Joseph X. Michaels (P79084)
CROSON, TAUB, & MICHAELS, PLLC
455 E. Eisenhower Pkwy, Ste. 75

Ann Arbor, Michigan 48108
(734) 519-0875
jmichaels@ctmlawyers.com

Dated: November 14, 2025          *Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
 **EASTERN DISTRICT OF MICHIGAN**
 **SOUTHERN DIVISION**


AUNDREA L. ARMSTRONG,

     Plaintiff,                                 Case No.

v.                                         Hon.


MONROE COUNTY, a Michigan
municipal corporation,
THE MONROE COUNTY
BOARD OF COMMISSIONERS,
DAVID VENSEL, in his individual
and official capacities, DAVID
HOFFMAN in his individual and
official capacities, JAY HEINSERLING
in his individual and official capacities,
J. HENRY LIEVENS in his individual
and official capacities, and RANDY
RICHARDVILLE in his individual
and official capacities, and WILLIAM
SISK in his individual and official
capacities

     Defendants.

_____

  Joseph X. Michaels (P79084)
  Adam M. Taub (P78334)
  Croson, Taub, & Michaels, PLLC
  Attorneys for Plaintiff
  455 E. Eisenhower Pkwy, Ste. 75
  Ann Arbor, Michigan 48108
  (734) 519-0872
  jmichaels@ctmlawyers.com
  ataub@ctmlawyers.com

_____

## PLAINTIFF'S JURY DEMAND

Plaintiff, Aundrea Armstrong, by and through her attorneys, CROSON, TAUB & MICHAELS PLLC, hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,
CROSON, TAUB, & MICHAELS, PLLC

*/s/ Joseph X. Michaels*
Joseph X. Michaels (P79084)
CROSON, TAUB, & MICHAELS, PLLC
455 E. Eisenhower Pkwy, Ste. 75
Ann Arbor, Michigan 48108
(734) 519-0875
jmichaels@ctmlawyers.com

Dated: November 14, 2025          *Attorney for Plaintiff*